CABLE v. UNITED STATES LIFE INS. CO. IN CITY OF NEW YORK.

UNITED STATES LIFE INS. CO. IN CITY OF NEW YORK v. CABLE.

(Circuit Court of Appeals, Seventh Circuit. October 1, 1901.)

Nos. 762, 775.

1. APPEAL—ASSIGNMENTS OF ERROR.

Where a master to whom a cause was referred to take and report the testimony exceeded his authority by reporting findings of fact and conclusions of law, to which the court entertained exceptions, some of which it sustained, and modified and adopted the findings, they must be regarded as the findings of the court, and an appellant may assign errors thereon in the appellate court, although he took no exceptions to the report of the master.

2. LIFE INSURANCE—STATEMENTS IN APPLICATION—CHANGE OF CONDITION BEFORE DELIVERY OF POLICY.

A statement made in an application for life insurance, whether a warranty or only a representation, speaks from the time of the delivery of the policy, and if, after the statement is made, a material change occurs in the condition of the applicant, covered by such statement, before the contract is consummated, an absolute duty rests upon the applicant to make disclosure of the fact.

**3. SAME—DELIVERY PROCURED BY FRAUD—CONCEALMENT OF FACTS.**

C. made application to complainant for a policy of life insurance. Among the statements in the application which were made warranties was one that the applicant had never had pneumonia, and it also contained a covenant that the policy should take effect only "upon payment of the first premium and delivery of the policy during my lifetime, sound health, and insurable condition." The policy was issued and tendered to C., who declined to accept it at the time on the ground that he had not sufficient time to examine it, and also wished to consult L., an intimate friend, who had made a similar application. C. shortly after became ill with acute pneumonia. Three days later the solicitor who had taken the applications called upon L., with whom he had left his policy for examination, and L. accepted the policy, and also offered to accept that of C., and to pay the premium thereon. The solicitor obtained the policy, and delivered it to L., receiving the premium thereon, which was forwarded to, and accepted by, complainant. In answer to an inquiry by the solicitor at the time of the delivery if C. was all right, L. replied that he had been sick two or three days, but was no worse than he had been for the past 48 hours. No further inquiry was made nor information given, although L. knew the serious nature of C.'s illness, and that he was not at the time in an insurable condition. Neither complainant nor its general agent had any actual knowledge or notice of C.'s illness until after his death, which occurred five days later. *Held*, that it was the duty of L. as C.'s agent to fully disclose his condition; that his partial statement was misleading, and not such as to put the agent on inquiry; and that the delivery of the policy under such circumstances did not create a contract binding on complainant, even though L. was guilty of no intentional fraud.

**4. SAME—WAIVER.**

The delivery of a life insurance policy, with notice that the insured is ill, will not operate as a waiver or create an estoppel which will preclude the company from asserting the invalidity of the policy under its terms, because the insured was not in an insurable condition, where material facts in regard to his condition were concealed from it which were of such nature as to make it clear that the policy would not have been delivered if they had been known.

**5. APPEAL—LAW OF CASE—DECISION ON FORMER APPEAL.**

A judgment on appeal sustaining the jurisdiction of the circuit court over the cause becomes the law of the case, and the question cannot be reconsidered on a second appeal.

Appeal and Cross Appeal from the Circuit Court of the United States for the Northern District of Illinois.

The United States Life Insurance Company in the City of New York filed its bill in equity against Alice A. Cable, administratrix of the estate of Herman D. Cable, deceased, for the cancellation upon the ground of fraud of a policy written by the company upon the life of the defendant's intestate. A demurrer to the bill was sustained, and upon appeal to this court the judgment of the court below was reversed, and the demurrer directed to be overruled. Insurance Co. v. Cable, 39 C. C. A. 264, 98 Fed. 761, to which reference is made for a statement of the allegations of the bill. Upon the filing of the mandate in the court below, an answer was filed to the bill admitting the fact of the application and of the policy as stated in the bill, but denying the fraud, and containing the following admissions and allegations: "Defendant, further answering, admits that said policy on the life of said Herman D. Cable was, after its execution, sent to the city of Chicago, but to which particular agent of the complainant in said city this defendant is not advised, except as she is informed by the bill of complaint filed herein; and defendant further admits that on or about the 21st day of February, 1899, said policy was tendered by the said James F. McCabe, as agent of the complainant, to said Herman D. Cable, and that at this particular time said Cable declined to take up the matter of said policy with said McCabe and pay the premium thereon, for the reason that he was then

too busy to examine the policy, and see whether it was the same in its terms and conditions as represented when his application was taken, and for the further reason that he desired to confer with his close and intimate friend, Mr. George S. Lord, who had made an application for insurance through the same agent in the same company, and to whom a policy had also been issued, but had not yet been delivered. Defendant, further answering, says that said Lord and said Cable were connected together by the closest ties of friendship, and were also interested together in various business enterprises, and were in almost daily communication with each other, and had been such friends and so interested in various business enterprises for many years prior to February, 1899, and that each was in the habit of acting for the other in matters in which they were mutually interested. Defendant, further answering, admits that upon the evening of the 24th day of February, 1899, said Cable became ill, and that upon the following day his illness was diagnosed as a slight attack of pneumonia, but denies that upon the 26th day of February the life of said Cable was despaired of by his physicians and family, or that any such report was in circulation, but says, on the contrary, that on the 26th and on the 27th days of February, 1899, his illness was not considered as at all dangerous, but a speedy recovery of said Cable was confidently expected by his said family and said Lord, and that no danger of death from said illness was at all apprehended by them or either of them. Defendant, further answering, admits that the said Lord was in daily communication with said Cable and his family during said illness, as had been his custom for many years prior thereto, but denies that he was informed that said Cable was in serious physical condition, and that his death was expected from the disease which he then had, but says that, on the contrary, said Lord believed and was informed by the family of said Cable that he was not considered to be in a dangerous condition. Defendant, further answering, admits that on the 27th day of February, 1899, said McCabe went to the office of said Lord for the purpose of ascertaining whether said Lord and said Cable would take said policies, and that he was then informed by said Lord that he, said Lord, was willing to take both of the policies, but that said Cable was then ill at his home in Evanston, and if said McCabe, with knowledge of this fact, desired to deliver said policies he would receive and pay for the same; that said McCabe then went from said office, and shortly after returned with the policy issued in favor of said Cable, and delivered the same to said Lord, well knowing and being informed of the true condition of said Cable, and that with such knowledge he received from said Lord the premiums upon both of said policies for the first year of the life of the same,—that is, from the 6th day of February, 1899, until the 6th day of February, 1900. Defendant further expressly denies that the illness of said Cable was not made known to the complainant, but was purposely and willfully concealed from it, but, on the other hand, defendant alleges that the true condition of said Cable was fully told and made known to the complainant prior to the delivery of said policy and the payment of the premium thereon. Defendant further denies that said Lord was not authorized by said Cable to accept said policy and pay the premiums thereon, but, on the contrary, alleges that he was requested by the said Cable to so receive said policy and pay the first premium thereon when he, the said Lord, should take his policy. Defendant, further answering, admits that the said Cable did on Thursday, March 2, 1899, depart this life, but denies that such death was occasioned by pneumonia, but was occasioned by heart failure, the result of sudden complications which arose a few hours before his said death, and which were not expected or apprehended by his family or physicians until a short time before they occurred."

On March 21, 1900, an order was entered that the cause be referred to a master "to take the evidence in said cause and report the same to this court." The master on October 5, 1900, filed his report, returning the evidence adduced before him, and reported 15 findings of fact, reference being here made to the following:

"(1) That the complainant is a corporation, duly organized under the laws of the state of New York, and a citizen of the state of New York, and has been for many years last past, and is now, engaged in the business of insur-

ing lives throughout the United States, and has been for many years, and is now, lawfully engaged in carrying on said business in the state of Illinois, under proper license, and that the defendant Alice A. Cable is a citizen of the state of Illinois, residing in the Northern district thereof. The business of the complainant in Chicago is in charge of a general manager for the states of Illinois and Wisconsin, who has supervision of the company's business, procuring applications, or seeing that they are procured, collecting premiums, attending to the detail work, looking after disbursements, looking after losses and furnishing proofs, and who is the supreme authority in the state of Illinois in said company's business in all cases in the agency work, and is hereinafter called 'general agent.'

"(2) That on or about the 16th day of January, 1899, Herman D. Cable, then a resident of Evanston, in the state of Illinois, made application in writing to the complainant, through one James F. McCabe, for insurance upon his life in the sum of fifty thousand dollars, which application was forwarded to the New York office of the complainant, and in consideration thereof the complainant, on or about the 6th day of February, 1899, executed its policy, numbered 94,082, upon the life of the said Herman D. Cable, which policy agreed, in further consideration of the sum of $848.50, to be paid on the delivery thereof, and a like sum to be paid on the 6th day of February in each and every year thereafter, until ten (10) years' premiums should have been paid, and upon the acceptance of satisfactory proofs of the death of the said Herman D. Cable within ten (10) years ending on the 6th day of February, 1909, that the complainant would pay fifty thousand dollars ($50,000) in thirty (30) consecutive annual installments, of one thousand six hundred sixty-six and sixty-six hundredths dollars ($1,666.66) each, to the estate of the said Herman D. Cable. The written application for the said policy was by the terms of the policy made a part of the policy itself, and was signed by the said Herman D. Cable, and one of the provisions of the said application was as follows, viz.: 'It is hereby declared and agreed * * * that the policy to be issued hereon shall take effect only upon payment of the first premium and delivery of the policy during my lifetime, sound health, and insurable condition;' and another provision thereof was as follows, viz.: 'That only the president, together with the secretary or the actuary, shall have the power to alter or waive the policy or any condition thereof.'

"(3) At the same time when Cable applied for the above policy, a similar application was made to the complainant for a similar $50,000 policy by George S. Lord, who was a neighbor and intimate friend of Cable, and interested with him in numerous business transactions, both being directors of the Bankers' National Bank and members of the Evanston school board. Both of the said policies were issued at about the same time, and both were forwarded from the New York office of the complainant to its Chicago office, and were received at the latter office on or before the 20th day of February, 1899, and on the last named day they were turned over by the complainant's general agent at Chicago to one T. J. Finney.

"(4) The said T. J. Finney was a life insurance broker, who was not regularly employed by the complainant or by any other company, but who had done business with the complainant through the said general agent, among other companies, for the past seven years, and had during the year 1898 procured other insurance on the life of the said Herman D. Cable in another company, which had lapsed in November, 1898. One James F. McCabe was also a life insurance agent or broker, who in January, 1899, had a contract of employment with the Equitable Insurance Company of New York, and who had no connection or business arrangement with the complainant, except through the said Finney, and was not known to the general agent of the complainant at Chicago in connection with the Cable policy until about the time when the application therefor was delivered to the complainant's general agent in Chicago, and was not personally known to said general agent until March 5, 1899. Upon the delivery of the said two policies to Finney, the gross amounts of the premiums due were charged against him by the complainant's general agent, and he subsequently paid to such general agent the amount due to the complainant out of such premiums.

"(5) The applications of both George S. Lord and Herman D. Cable for insurance were obtained from them by the said McCabe, under an agreement with the said Finney, and when procured were delivered by him to Finney. After the two policies had been received by the complainant's general agent in Chicago, and had been turned over by him to Finney as aforesaid, the latter in turn delivered them to the said McCabe, on the 21st day of February, 1899. Thereupon, on the same day, McCabe called first at the office of Herman D. Cable, having both of the said policies with him, but the said Cable refused to accept his policy at that time, stating that he did not have time to look into the matter at the moment, but that he would be guided a good deal by what Mr. Lord said and did in the matter. Afterwards, on the same day, McCabe called at Mr. Lord's office, found Mr. Lord very busy, and left his (Lord's) policy with him, together with a financial statement of the company, and told him that he might send him (McCabe) a check for it. On the same day McCabe returned the Cable policy to Finney.

"(6) On the 27th day of February, 1899, McCabe again called upon George S. Lord, and asked for payment of the premium on his policy. Mr. Lord thereupon asked him if he also had the Cable policy with him. McCabe stated that he had not, but that he could get it in a few minutes; whereupon Mr. Lord told him to get it, and he (Lord) would pay him the amount of both premiums. McCabe then went at once to Finney's office, procured the Cable policy from Mr. Finney, and returned with it to Mr. Lord's office, and handed it to Mr. Lord, saying as he did so, 'Is Mr. Cable all right?' or words substantially to that effect. There was a conflict as to what Mr. Lord said in reply, but the master is of the opinion that the reply was substantially as Mr. Lord stated in his testimony, viz.: 'No; Mr. Cable has been sick for two or three days, but he is no worse than he has been for the last forty-eight hours.' Thereupon McCabe left the Cable policy with Mr. Lord, who already had his own policy, and Mr. Lord paid the premiums on both policies in currency, the premium on the Cable policy being eight hundred and forty-eight dollars and fifty cents ($848.50), and McCabe took the money to Mr. Finney, who subsequently paid to the complainant the amount due to it. Mr. Lord then took the Cable policy to Evanston, and delivered it to a member of Mr. Cable's family at the latter's house, in the evening of the same day. The master finds that Lord had been authorized in advance by Herman D. Cable to accept and pay for the latter's policy, in case he (the said Lord) decided to accept and pay for his own policy, and that the premium advanced by him was repaid to him after Cable's death by one of the relatives of the said Cable.

"(7) Immediately after delivering the said two policies to Lord, McCabe went to Cleveland, Ohio, and while there he received, on March 2, 1899, a telegram from Finney, reading as follows: 'Cable died this morning. Was sick when policy delivered. Company want policy back. Am noncommittal pending hearing from you. Have you any advice?' (See Complainant's Exhibit 3.) McCabe thereupon returned to Chicago on March 3, 1899, and on that day informed Mr. Lord, and also the latter's attorney, Mr. H. H. C. Miller, that the complainant company demanded the return of the Cable policy.

"(8) The master finds that on the 21st day of February, 1899, when the policy in question was first presented to Herman D. Cable and he refused to receive it, he was in sound health and insurable condition; that on the 24th day of February, 1899, he was taken ill with incipient pneumonia, and was attended by a physician in the early evening of that day, and was put under the care of a trained nurse the same evening; that his disease developed into a case of acute pneumonia, and that he was seriously ill with that disease and confined to his bed from the evening of the 24th day of February, 1899, until March 2, 1899, when he died; that on the 27th day of February, 1899, the said Herman D. Cable was seriously ill with acute pneumonia, and was not in good health, and was not in insurable condition, and that this was well known to the said George S. Lord when he procured the delivery to himself of the Cable policy, and paid the premium thereon, but that he did not communicate such knowledge to the said McCabe any further than by making the statement to him which has been set forth

heretofore in finding 6; and the master finds that the said Lord's statement that Cable had been sick for two or three days, but was no worse than he had been the last forty-eight hours, while it was substantially true at the time when it was made, was deceptive in its nature, and not calculated or intended to inform McCabe as to the serious condition of Cable's health, or to lead him to suspect it.

"(9) The master further finds that up to the last day of said Cable's illness the said illness was not such as to be regarded by his physician and friends as necessarily fatal; that up to the day before his death his attending physician expected him to recover, and so informed his family; that the immediate cause of his death was heart failure, or collapse, which was the result of his illness, and which is one of the common features of pneumonia.

"(10) The master further finds that none of the general officers of the complainant company residing in New York City had any personal knowledge that the said Herman D. Cable was taken ill at any time after the application for the policy in controversy was made, and that none of them had any personal knowledge until after his death that he was ill at any time between the date of the application and the date of his death, and that neither the said Finney nor the said McCabe (excepting the statement made to him by Lord on the delivery of the policy), nor the general agent of the complainant at Chicago, nor the complainant itself, had any knowledge or information as to the said Cable's condition of health at any time between the date of the application for the policy in question and March 2, 1899, but in making this and all other findings the master expressly reserves the question as to whether the information conveyed by George S. Lord to McCabe was or was not, such notice as to bind the complainant company and its representatives.

"(11) That on or about the 16th day of March, 1899, the defendant, Alice A. Cable, was by the probate court of Cook county duly appointed as administratrix of the estate of the said Herman D. Cable, deceased, and qualified, and took upon herself the duties of such trust, and that as such administratrix she took possession of the said policy in controversy, and has ever since been in possession of the same; that as such administratrix she filed with the complainant proof of the death of the said Herman D. Cable, and requested payment to her of the commuted value of the unpaid installments of $1,666.66 each, specified in the said policy, being the lump sum of thirty thousand dollars ($30,000), and that the complainant refused to pay the same, and that the defendant herein brought her action at law against the complainant in the superior court of Cook county, Illinois, on May 11, 1899, to recover $30,000 upon the policy offered in evidence in this case, as the commuted value of such policy; that such action was begun by the filing of a præcipe and the issuance of a summons on said day, about an hour prior to the filing of the original bill herein; that such summons was placed in the hands of the sheriff of Cook county for service upon the defendant immediately upon its issuance, and prior to the filing of the original bill herein, but was not served upon the complainant herein until May 15, 1899, and that no direction to the sheriff to delay the service of summons was given by the plaintiff in said action at law, or her attorney, which action at law is still pending and has never been called for trial, but now stands number 148 upon the new calendar of Judge Chytraus, which said judge began to call September 15, 1900.

"(12) The master further finds that before the filing of the bill herein the complainant offered to pay to the defendant herein the amount of the first premium upon the policy in controversy, together with interest thereon, but the offer was refused by the said defendant, Alice A. Cable, administratrix of the estate of Herman D. Cable, deceased.

"(13) The master finds that there has been no evidence adduced before him showing or tending to show that any of the conditions of the policy in controversy have been waived by the president and secretary or actuary of the complainant, or any or either of them, and also finds that the general agent of complainant in Chicago never authorized either said McCabe or said Finney to waive any of the conditions thereof, and never waived any of them himself.

"(14) That the said Herman D. Cable and George S. Lord, in the making of the application to the complainant and in the delivery of the policies and payment of the premiums thereon, had no dealings with any person other than the said James F. McCabe."

Before the filing of the report Alice A. Cable, administratrix, filed with the master certain objections to his report, which were apparently returned to the court by the master with his report and read as follows: "First, for that the master has erroneously found that the statement made by George S. Lord to James F. McCabe as to the illness of Herman D. Cable was deceptive in its nature, and not calculated or intended to inform McCabe as to the serious condition of Cable's health, or lead him to suspect it; second, for that the said master has omitted to find that on the 27th day of February, 1899, it was the full belief of George S. Lord that said Cable was not dangerously sick, and that he would shortly recover from his then illness; third, for that the said master has omitted to find that the information conveyed by the said George S. Lord to said James F. McCabe was sufficient notice of the illness of Herman D. Cable at and before the time of the delivery of the policy and the payment of the premium thereon; in all of which particulars the said defendant objects to the said report, and submits that the same ought to be varied and altered."

On October 23, 1900, the court ordered that the objections referred to stand as exceptions to the report, and thereupon the cause was heard before the court. Afterwards, on December 21, 1900, the court rendered a decree sustaining the first exception, and disapproving of the second sentence in paragraph 8 of the master's report, and made the following finding of fact in lieu thereof: "That on the 27th day of February, 1899, the said Herman D. Cable was seriously ill with acute pneumonia, and was not in good health, and was not in insurable condition, and that the said George S. Lord when the Cable policy was delivered to him and the premium paid thereon was aware of such fact; that when said Lord was asked by McCabe, as the agent of the complainant, as to the then condition of Herman D. Cable, he in good faith, and without any intent to defraud the complainant or conceal the real condition of the health of said Cable, stated that Cable had been sick for two or three days, but was no worse than he had been during the last forty-eight hours, as heretofore found in finding 6, but that said Lord did not make any further statement in regard to the condition of said Cable, nor were any further inquiries made by said McCabe in regard thereto."

The decree overruled the second and third exceptions to the master's report, and decreed that the policy in question "was procured on behalf of the said deceased by constructive fraud, and that no actual fraud was intended or practiced in the delivery of the same, and that the complainant is entitled to the relief prayed for," and thereupon decreed that the policy be annulled and canceled and declared to be of no force and effect as an obligation; that it be forthwith surrendered and delivered; and reserved jurisdiction to make such further order as might be necessary to secure the full and effectual execution of the decree, including power and jurisdiction to prevent the defendant from prosecuting any suit or action upon the policy. From this decree the defendant below appealed.

The complainant below also filed an assignment of errors, as follows:

"(1) That the circuit court erred in and by said decree in finding that the master's report was made pursuant to the order of reference to said master, and in entertaining and acting upon exceptions thereto; (2) that the circuit court erred in and by said decree in sustaining the following exception filed by the defendant to the master's report: 'First, for that the master has erroneously found that the statement made by George S. Lord to James F. McCabe as to the illness of Herman D. Cable was deceptive in its nature, and not calculated or intended to inform McCabe as to the serious condition of Cable's health, or lead him to suspect it.' (3) That the circuit court erred in and by said decree in finding that, at the time Lord procured from McCabe the Cable policy, Lord told McCabe that Herman D. Cable had been sick for two or three days, but was no worse than he had been for the last forty-eight hours. (4) Assuming that Lord made said statement as

found, the circuit court erred in and by said decree in further finding that it was made by Lord in good faith, and without any intent to defraud the complainant, or to conceal the real condition of the health of said Cable. (5) That the circuit court erred in and by said decree in finding that no actual fraud was intended or practiced in the delivery of the policy of insurance mentioned in said decree. (6) The circuit court erred in not finding that the delivery of the policy in controversy was procured by actual fraud. Wherefore the said complainant prays that the parts of said decree upon which error is above assigned may be changed and modified, and that as a basis for the relief granted by said decree a finding of fact be made that the delivery of the policy in controversy was procured from the complainant by actual fraud."

On the back of the policy, under the title "Notice," it is provided: "Agents have no power to modify or change this contract, nor extend time for premium payment, nor waive forfeiture."

William G. Beale, for Insurance Co.

W. S. Oppenheim, for Cable.

Before WOODS, JENKINS, and GROSSCUP, Circuit Judges.

JENKINS, Circuit Judge, after the foregoing statement of the case, delivered the opinion of the court.

The action of the master in reporting his findings of fact and his conclusions of law upon the evidence was without authority, the order of reference only providing for the taking and return of testimony. The court, however, modified and adopted the findings, and they must be regarded as the findings of the court. An assignment of error to the decree gives the right to a hearing here upon an error well assigned, although no exception was filed to the master's report.

It is a general rule that meditated silence, there being no duty to speak, will not avail to avoid a contract. There being no duty to communicate intelligence, the one party is not bound to speak although he may know that the other party lies under a mistake. This is because the parties are dealing with each other at arm's length. But even in such case the suppressio veri must rest in silence, not in partial and misleading statement. The latter amounts to suggestio falsi; for, as it has well been said, "a half truth is often the greatest of lies." If one would deal at arm's length, he must remain silent. He may not speak that which is certain to deceive and suppress that which would challenge attention, disclosing the truth. If the matter be with respect to a material fact which, if known to the one party and not to the other, would, if disclosed, induce that other to refrain from contracting, either wholly or upon the terms proposed, the one having knowledge of the fact, if under no duty to disclose, may not by a partial statement throw the other party off his guard, when disclosure of the truth and the whole truth would have prevented his action.

There is, however, a class of contracts, not arising in confidential relation, where there is a duty to speak, where silence is tantamount to fraud, because "the silence goes to the very essence of the transaction, preventing the existence of any contract, when the transaction takes the form of contract, for want of union of minds between the parties." Bigelow, Frauds, 594. This class of contracts comprehends many subjects, and especially the subject of insurance.

Thus, in marine insurance, the applicant owes the duty of disclosure. If he conceals a material fact, whether or not he be inquired of concerning it, the policy is void, even though his silence arose from error of judgment, and not from fraudulent intent.     This is sometimes rested upon the ground that the silence is a breach of the condition precedent of every contract of marine insurance, "that the insured shall make full disclosure of all facts materially affecting the risk, which are within his personal knowledge at the time when the contract is made."   Blackburn v. Vigors, 12 App. Cas. 531; Arn. Ins. (4 Eng. Ed.) 512.   Thus, where insurance was applied for upon a vessel "lost or not lost," the applicant knowing of its loss, but concealing his knowledge from the insurer, the court held the concealment to be a fraud destroying the validity of the contract, remarking (page 670, 15 Wall., and page 247, 21 L. Ed.):   "When the company came to make this instrument, they were entitled to the information which the plaintiffs had of the loss of the vessel."   Insurance Co. v. Lyman, 15 Wall. 664, 21 L. Ed. 246.   So, also, with respect to fire insurance, it has been held that if one knowing of a conflagration near his property, without disclosing the fact, procure insurance of an underwriter ignorant of the fact, the contract is void.   Bufe v. Turner, 6 Taunt. 338.   A well-considered case upon the subject of disclosure with respect to fire insurance is Insurance Co. v. Harmer, 2 Ohio St. 452, in which it is held by Ranney, J., that the doctrine of concealment as understood in marine insurance is not applicable in its full extent to fire policies, because the corpus is subject to inspection by either party, but that the assured must not misrepresent or designedly conceal a fact of unusual peril to the property not with reasonable diligence discoverable by the insurer, or anticipated as a foundation for specific inquiry.

In respect of marine insurance, one reason for the requirement of disclosure is that the corpus is often not accessible to the insurer, and reliance must be placed upon the good faith of the insured.   In this respect life insurance is more nearly allied to marine than to fire insurance.   It is true that a medical examination will ascertain many things necessary to be known; but there is a large field of inquiry which cannot be so disclosed, and which may be essential to the risk to be assumed.   The past history of the insured, the diseases with which he had been afflicted, the duration of life of his ancestors, and their diseases, are all matters which go to the question of the assumption of the risk, and of which the insurer would naturally desire information.   So, also, in the interval between the medical examination and the execution and delivery of the policy, a serious change in the health of the assured may have occurred, of which the insurer might be, and probably would be, wholly ignorant.   The insurer has therefore a right to rely upon the utmost good faith upon the part of the assured, and though the latter may not be bound to communicate, if uninquired of, all the details of his life which might affect the judgment of the insurer with respect to the assumption of the risk, he is certainly bound to disclose any impending peril to life not known to the insurer, and of which the latter cannot reasonably be said to be put upon inquiry.   It is the custom of insurance companies

to act upon written or printed applications signed by the applicant containing answers to questions propounded. Generally, as is the fact here, by the terms of the contract the application is made part of and attached to the policy of insurance. In such case the answers to the questions are warranties, and no suggestion of immateriality of the question and answer can be entertained, because it is for the insurer to judge of the materiality of the information demanded and of the reasons that shall determine the assumption of the risk.

In the case at bar, Cable in the application was inquired of whether he had ever been subject to or had pneumonia, to which he gave a negative answer. This application being made part of the contract, the statement is a warranty, and is so declared to be by the application. This statement, in the law, refers not merely to the date of the application, but to the time of the completion and delivery of the contract. And if, after the statement is made, a material change occur before the contract is consummated, the duty of disclosure on the part of the assured, or the one receiving delivery of the policy for him, is absolute. The application of Cable covenanted that the policy should take effect only "upon payment of the first premium, and delivery of the policy during my lifetime, sound health, and insurable condition." The statements in the application of good health and freedom from disease, and specifically from pneumonia, constitute a warranty of the contract as though declared simultaneously with the delivery of the policy. If there had been a change in health between the date of the application and the delivery of the policy, the company was entitled to know of it, and to be fully informed concerning it, that it might determine whether, notwithstanding such change, it would consummate the agreement and deliver its policy; for, as stated in Traill v. Baring, 33 Law J. Ch. 521, 9 Law T. (N. S.) 708, on appeal 10 Law T. (N. S.) 215, if a person make a representation which is calculated to induce another to assume a particular liability, and the circumstances are afterwards, before the liability is assumed, so altered to the knowledge of the person making the representation that the alteration might affect the course of conduct of the person to whom the representation was made, it is the imperative duty of the person who made the representation to communicate to the person to whom he made it the alteration in these circumstances, and a court of equity will not hold the person to whom he made the representation to be bound by any contract entered into upon the faith thereof, unless such communication has been made. In British Equitable Ins. Co. v. Great Western Ry. Co., 38 Law J. Ch. 132, 19 Law T. (N. S.) 476, in July, a declaration was signed for insurance upon life containing reference to the usual medical attendance of the proposed assured, who certified that the proposed assured was in good health. The assured was also required to state who was "his latest, if other than his usual, medical attendant." It was provided in the letter accepting the proposal and in the receipt for the first premium that if any change had taken place in the health of the assured since the date of the medical examination it would render the policy void. In August the assured consulted another physician, who discovered his patient to be suffering from disease

of the kidneys. This fact was not communicated to the company, and the policy was delivered in September. Eight months afterwards the assured died of disease of the kidneys. It was held that the requirement to disclose his last medical attendant was a continuous one up to the date of the completion of the contract; that the noncommunication of his visit to the physician in the interval between the signing of the application and the taking of the policy voided the policy. This decree was affirmed upon appeal. 38 Law J. Ch. 314, 20 Law T. (N. S.) 422. In Morrison v. Muspratt, 4 Bing. 60, one was represented to the insurers in December of a certain year by a physician as enjoying ordinarily a good state of health. This representation was repeated in March following, and the insurance was effected in April. Between December and March the person had been ill with a pulmonary attack, and was attended by a physician other than the one who had made the representations to the insurance company, but no disclosure of the circumstance was made to the insurer. In April, a year after the issuance of the policy, the assured died of pulmonary disease. This was a case of mere representation, not of warranty, and the court held that the facts of the illness and of the attendance of the other physician should have been disclosed. See, also, Rose v. Society, 11 Ct. Sess. Cas. (2d Series) 345; Society v. McElroy, 49 U. S. App. 548, 28 C. C. A. 365, 83 Fed. 631. In Insurance Co. v. Ewing, 92 U. S. 377, 23 L. Ed. 610, the applicant being in extremis, a friend paid the premium, but concealed from the agent the condition of the applicant. The agent delivered the policy in ignorance of the facts. The court held there was no valid contract, saying (page 380, 92 U. S., and page 612, 23 L. Ed.): "It cannot for a moment be contended that while parties are still in negotiation as to the terms of a contract, one of them, learning of a total change in the condition of the subject-matter of the contract of which the other is ignorant, can at that moment accept terms which he has refused before, and by so doing bind the party who has offered those terms when the condition of affairs was wholly different;" and at page 381, 92 U. S., and page 613, 23 L. Ed.: "To hold that when he was in extremis, an hour or two before he breathed his last, a friend should pay this small sum to an agent of the company, without the agent of the company having any idea of the condition of the dying man, and thus secure an obligation to pay his administrator $5,000 within sixty or ninety days, is to affirm that one party to a negotiation can delay his assent to the terms of the contract until the changes of fortune enable him to reap all the benefits, and throw all the losses on the other side, and then, for the first time, do what was necessary on his part to make the contract obligatory." There was therefore here both a warranty of good health and insurable condition at the time of the delivery of the policy, and, whether the statements of the application be treated as warranty or as representations, they were continuing up to and were effective as representations or warranties at the time of the delivery of the policy. 1 May, Ins. (4th Ed.) § 190. Independent of these considerations, and growing out of the very nature of the subject-matter, there was the legal obligation resting upon Cable,

and upon those acting for him, to disclose any material change in his condition of health between the time of the application and the time of the delivery of the policy.

Was there such a change of health, and was the duty of disclosure performed? The application is dated January 16, 1899, and by the contract is made a warranty, and, as we have sought to show, that warranty speaks from the date of the delivery of the policy. That warranty was broken as soon as made, for at the time of the delivery of the policy he had pneumonia, and that fact was not disclosed to the company, or to the one who for the company delivered the policy to Lord, the latter knowing of the fact.

It is, however, urged that sufficient information was disclosed by Lord to McCabe to put the company upon inquiry, and that, with such notice, McCabe delivered the policy and received the premium; that McCabe was the agent of the company, and notice to him was notice to the company, and the delivery of the policy constituted a waiver of the condition and warranty. Upon the assumption that McCabe was such agent of the company, and that his action must be treated as the action of the company,—questions which we do not determine,—it becomes us to inquire of the sufficiency of the notice given, and whether the act of delivery of the policy involved a waiver of the warranty.

On February 21, 1899, Cable had tentatively declined to accept the policy, desiring to be guided in his judgment by the action of his intimate friend Lord, who had made a like application upon his own life to the same company. The policy was thereupon returned by McCabe to Finney, the broker from whom he received it. The policy on Lord's life was on the same day left with him, and he was requested to send a check for the premium. Six days afterwards, and on the 27th of that month, McCabe called upon Lord and asked for the payment of the premium upon his policy. Lord asked him if he had the Cable policy, to which McCabe answered "No," but that he could get it in a few minutes; whereupon Lord told him to get it, and that he (Lord) would pay him the amount of both premiums. McCabe procured the Cable policy, returned with it to Lord's office, and handed it to the latter, saying as he did so, "Cable is all right, isn't he?" Here occurs somewhat of a conflict in the evidence. McCabe says that Lord, in a very low voice, without looking at him and in a casual manner, answered, "The same as he has been for forty-eight hours;" conveying to McCabe's mind the meaning that Cable was all right. Lord says that he answered: "No; Mr. Cable has been sick for two or three days, but he is no worse than he has been for the last forty-eight hours." The master and the court below found the fact to be as stated by Lord, and, while there is much in the testimony throwing doubt upon the correctness of this conclusion, we are content to take the fact as found by the master and adopted by the court. Lord at this time knew that Cable was seriously ill with acute pneumonia, that he was not in good health, and that he was not in insurable condition. Lord was a man of affairs, actively interested in many important business adventures. He must have known—he was bound to know—that no sane man, fully

informed of Cable's condition, would accept insurance and deliver a policy upon such a life. It was his duty to have disclosed the facts, and whether failure so to do arose from design or forgetfulness the fraud upon the company was none the less.. The wrong that was effected cannot be excused upon the ground that Lord did not intend to commit the wrong. Those whom he represented cannot be permitted to take the fruit of the wrong upon the ground that Lord was innocent of wrongful intent. In Sun Mut. Ins. Co. v. Ocean Ins. Co., 107 U. S. 485, 510, 1 Sup. Ct. 582, 599, 27 L. Ed. 337, 345, the court, speaking of the duty of disclosure in respect of insurance, says: "The duty of communication, indeed, is independent of the intention, and is violated by the fact of concealment, even where there is no design to deceive."

Nor do we think that the statement was such that a reasonable man would have been put upon inquiry. It was a casual statement, partial and misleading, and the manner of its delivery was, in our judgment, such as to ward off rather than to invite inquiry, and to convey to McCabe the impression that Cable was, if at all, but slightly indisposed. In order to preclude the insurance company by the action of McCabe, the latter should have been fully informed of the situation; for a waiver cannot be predicated upon a partial and a misleading statement. It was held in Sun Mut. Ins. Co. v. Ocean Ins. Co., 107 U. S. 485, 1 Sup. Ct. 582, 27 L. Ed. 337, that it was the duty of the assured to communicate all material facts, and he cannot allege as an excuse for his omission to do so that they were actually known to the underwriter, unless the knowledge of the latter was as full and particular as his own information. A waiver is an intentional relinquishment of a known right,—an election by one to dispense with something of value, or to forego some advantage that might be insisted upon. A waiver exists only where one with full knowledge of a material fact does or forbears to do something inconsistent with the existence of the right, or of his intention to rely upon that right. Bish. Cont. § 792. Waiver is but another name for estoppel. "It can only be invoked where the conduct of the companies has been such as to induce action in reliance upon it, and where it would operate as a fraud upon the assured if they were afterwards allowed to disavow their conduct and enforce the conditions. To a just application of this doctrine it is essential that the company sought to be estopped from denying the waiver claimed should be apprised of all the facts, of those which create the forfeiture, and of those which will necessarily influence its judgment in consenting to waive it. The holder of the policy cannot be permitted to conceal from the company an important fact, like that of the assured being in extremis, and then to claim a waiver of the forfeiture created by the act which brought the insured to that condition. To permit such concealment, and yet to give to the action of the company the same effect as though no concealment were made, would tend to sanction a fraud on the part of the policy holder, instead of protecting him against the commission of one by the company." Insurance Co. v. Wolff, 95 U. S. 326, 333, 24 L. Ed. 387, 390.

It cannot here be doubted that if the insurance company, or McCabe as its agent, had been informed of the fact, within the personal knowledge of Lord, that Cable was seriously ill with acute pneumonia, the policy would not have been delivered. It is difficult for us to believe that Lord, with that knowledge, could think he had a right to accept this policy; but, whether so or not, the concealment of the fact was a fraud upon the company. The statement made was deceptive and misleading, whatever were the intentions of Lord, and a court of equity ought not to permit the completion of the wrong. Courts of equity cannot sustain an insurance upon the life of a dying man, when the nature of his malady and the seriousness of his illness are concealed from the insurer.

It was suggested that in view of the decision of the supreme court in Farmers' Loan & Trust Co. v. Lake St. El. R. Co., 177 U. S. 51, 20 Sup. Ct. 564, 44 L. Ed. 667, we should reconsider our former judgment in this case, and dismiss the bill for want of jurisdiction. We are unable to see that the decision referred to is in conflict, but whether so or not the previous judgment of this court is res judicata between these parties, and we are without authority to disturb it. In this connection, and upon the question of jurisdiction, the case of Ogden City v. Weaver (C. C. A.) 108 Fed. 564, 567, may prove of interest.

GROSSCUP, Circuit Judge. The jurisdictional question was settled on the former appeal. Under our ruling in Supreme Lodge v. Lloyd (C. C. A.) 107 Fed. 70, that decision becomes a part of the law of this case. With the jurisdictional question thus out of the way, I concur in the foregoing opinion.

The decree is affirmed.

WOODS, Circuit Judge, sat at the hearing of this cause, and concurred in the conclusion reached, but departed this life before the preparation of this opinion.