W. F. NOBLE, Appellee, v. W. C. RENNER, Appellant.

**VENDOR AND PURCHASER:** Rescission by Purchaser—Fraudulent
1  Representation—Non-reliance Thereon. Contracts of sale may not be rescinded by reason of vendor's false representation, when vendee made his own examination of the property and, by reason thereof and of other knowledge brought to his attention, he evidently did not rely on the representations made by vendor.

**VENDOR AND PURCHASER:** Rescission by Purchaser—Fraudulent
2 **Concealment—Duty to Speak.** Concealing a fact material to a transaction, knowing that the other party is acting in the full belief that no such fact exists, and affirmatively encouraging such belief, is as much a fraud as if the existence of such fact were expressly denied, and entitles the one defrauded to rescind. So held where a vendor, who knew that vendee had examined the land and knew that vendee was acting in the belief that no serious danger existed from washing by the river, subsequently learned that the river was rapidly washing away the land, and did not communicate such fact to the vendee, and encouraged vendee to believe that the conditions remained the same as when vendee examined the land.

**VENDOR AND PURCHASER:** Rescission by Purchaser—Defense—
3 **Contracting in Recognition of Defects.** Evidence reviewed, and held insufficient to show that the defects in the land, of which vendee complained in his action for rescission, were taken into consideration in fixing the purchase price.

**VENDOR AND PURCHASER:** Rescission by Purchaser—When
4 **Vendee Entitled to Money Judgment.** Prompt and justifiable rescission by a vendee entitles him to a money judgment against the vendor for the loss, when vendor has sold the property received to an innocent purchaser.

*Appeal from Black Hawk District Court.*—FRANKLIN C. PLATT, Judge.

TUESDAY, SEPTEMBER 26, 1916.

ACTION to rescind a trading contract, on the claim that it was induced by false representations and fraudulent concealments. The property received by defendant was sold to an innocent purchaser, and plaintiff claims a money judgment for its value. The contract was rescinded, and a money judgment entered against defendant and a surety of defendant's on bond to discharge an attachment. Defendant and his surety appeal.—*Affirmed.*

*Feely, Feely & Clark,* for appellant.

*Mears & Lovejoy* and *W. H. Merner,* for appellee.

SALINGER, J.—I.   Appellee asserts that defendant represented that land transferred to him in the trading contract could not "crumble or wash into the Missouri River," and, in essence, that, for reasons pointed out, the river did not cut the land.   Further, that these representations were untrue, and known to the maker to be untrue.   This we will assume to be so.   It is further claimed that the representations were relied on.   This must be taken with some grains of allowance.   The agent of the plaintiff informed him, before any dealing was done, in effect, that the river was cutting this land.   He had information from one Dunn that buying the land was too risky on account of the river's washing, and that Dunn had heard of pieces' washing badly. Plaintiff was advised that banks would not loan money on these river farms.   He gives no reason for relying on defendant, except that he knew the "Ford family, and knew they were all nice, straight people, and that he knew the connection," which probably means that defendant was some connection of the Ford family's.   Defendant urged him to make a personal inspection, and plaintiff was evidently not fully controlled by the representations, for he did make the inspection.   He refused to deal until he could have consultation with his family and partner.

1. VENDOR AND PURCHASER: rescission by purchaser: fraudulent representation: non-reliance thereon.

To affect plaintiff with the consequences of his inspection, defendant gives a very exaggerated account of what the plaintiff saw on the inspection.   One item is that he saw a piece of land, nearly half an acre, fall into the river.   Plaintiff responds that all this is grossly exaggerated, and that he would have been a lunatic had he consummated the deal after seeing what defendant claims he saw.   We think defendant's account *is* grossly exaggerated, and that the truth is, plaintiff came away believing that whatever cutting there was, was temporary, and would cease when a point containing three acres, and just south of a bend in the river, would be cut away, and that this would soon occur.   Plaintiff answers him-

self. When he denies seeing what defendant claims he saw, he, so far as he is concerned, destroys any argument based on his folly if he had, in truth, seen what it is claimed he saw. Plaintiff may not avoid the consequences of his inspection by urging a state of facts which he says did not exist. Were this all, we should reverse.

II. Plaintiff pleads that defendant fraudulently failed to disclose a change in circumstances occurring after the inspection, consisting of the fact that the river was cutting most seriously—well knowing plaintiff was ignorant thereof. Appellant urges that the court erred in holding that he owed any duty to disclose his knowledge of such change, and holding that mere silence was, in the absence of such duty, fraudulent. Now, though defendant knew the tendency of the river to constantly reduce the acreage of his farm, and had actually sued his own vendor for damages because of land shortage, and obtained a settlement for it, we are not concluding him by this. Were this merely a case of defendant's having this general knowledge, we could well say that plaintiff had every opportunity to have the same knowledge, and ought not to ask a court of equity for relief merely because he refrained from obtaining such knowledge. But the contract was not closed until May 2d, and plaintiff returned on April 17th. On the very day of the return, defendant received information from one Kelley, afterwards supplemented by telegraph and telephone, which is fairly outlined by the statement in the telegram: "Situation serious. Come at once." And one Rouse advised defendant of like information from Kelley. Defendant denied having such information, and was told by Rouse that he should inform plaintiff. While defendant attempts some quibbling along the line that he was not greatly impressed, because he believed Kelley was merely trying to get a chance to buy the buildings for lumber by asserting that they were about to be washed into the river, he says, finally, that from information received

*2. VENDOR AND PURCHASER: rescission by purchaser: fraudulent concealment: duty to speak.*

he knew that the river was washing badly, was cutting the farm very badly, and was cutting in towards the buildings. It is not necessary to go into the details of the damage of which defendant was advised, beyond saying that it is unreasonable to suppose that plaintiff would have consummated the contract had he been advised of such damage. He had no knowledge of the change, nor that defendant had received said information.

It is the theory of appellant that he owed no duty to speak, because this is not a case of the river's cutting, but of continuing to cut as it did when plaintiff saw the land; that both had equal opportunity to learn of this change; and that while, in the authorities presented by appellee, there was some new element of which one party had knowledge, and which he concealed from the other, in this case there was no element which did not exist from the beginning. He illustrates: One might as well say that there was an actionable misrepresentation because a horse was represented as perfectly sound, when inspection made before buying showed that the horse had lost a leg. Is there not more here than a mere case of silence which amounts to a failure to state that which both knew, or had equal means of knowing? Is there not affirmative concealment, intended to lead another to his injury? Is not appellant proceeding on the lines that he might tenably use if he, too, had been ignorant of what, of necessity, occurred since plaintiff inspected the land? If neither had been advised, and the change had occurred since the inspection, there would be room for saying that defendant had no duty to make sure whether conditions had not changed, and advise plaintiff. But defendant knew not only that plaintiff had made inspection, but that he would naturally rely upon what he found then, and knew that conditions had changed for the worse since then, and that plaintiff did not know it. It is undenied, too, that defendant was not content with mere silence. It appears that, on May 2d, before the

contract was signed, defendant told Noble that there was no cutting there any more, that there would be a little sloughing of the bank in the spring when the frost was going out. This can have been intended for no other purpose than to strengthen Noble in the belief that conditions remained substantially as they were when he saw the land, and surely tended to do so. And on the morning of May 2d, defendant told plaintiff that he would guarantee there were 114 acres, which was again calculated to keep plaintiff in the same misapprehension.

Defendant explains that he did not tell Noble anything, because Noble had seen the farm and knew more about it than he (Renner) did. It is a sidelight that, somehow, after the deal was safely landed, and on May 7th, Renner all at once found occasion to tell Noble that the buildings were in danger. There are other suggestive sidelights. The telephone talk from Kelley was about eleven in the forenoon of May 1st, and, as defendant himself puts it, he went straight to Cedar Falls in the afternoon, and again opened negotiations with Noble to make this deal—kept it up until the morning of the second, and "until I got him into this contract."

More: Hill, a witness for defendant, says the latter told him to go to Waterloo for the purpose of putting a clause into the contract, "subject to changes of the Missouri River." This is explained by saying that it was desired to create a merger to exclude testimony as to oral guaranties of acreage. No doubt it may have that effect, but the desire to avoid an oral guaranty seems to have been carried to a point where only a very guileless man may fail to see some other and additional purpose. The contract contains the statement that the land to be conveyed contains 114 acres, more or less, as shown by a described survey, "subject, however, to the changes of the bed of the Missouri River, which bounds said land on the west." That fairly well accomplishes shutting out a quarrel over how much land was to be conveyed. Why, then, was added this further phrase: "Said land

having been viewed by party of the first part in April, 1912?'' It is not a great strain to arrive at the conclusion that, with the knowledge communicated by Kelley in mind, and not disclosed, this was but another method of affirmatively lulling the buyer into the belief that conditions were as he saw them on his inspection. No other reason readily suggests itself. On page 424 of 9 Cyc., it is said that, ''if a person make a representation, believing it to be true, but afterward he discovers it to be false, he must not allow the party to go on and act on the faith of the representation; and if he does so, he is guilty of fraud.'' In *Traill v. Baring,* 4 DeG., J. and S., 318, 329, cited under this text, it is said:

''If a person makes a representation by which he induces another to take a particular course, and the circumstances are afterwards altered to the knowledge of the party making the representation, but not to the knowledge of the party to whom the representation is made, . . . it is the imperative duty of the party who has made the representation to communicate . . . the alteration of those circumstances; and that this court will not hold the party . . . bound unless such a communication has been made.''

But the decision is a refusal to grant specific performance. As this is a discretionary act, the case is not square authority for the claim that such silence constitutes fraud.

20 Cyc., page 24, declares that, even if representations are true when made, and they subsequently become false by change in the subject-matter, it is the duty of the person who made these representations to inform the other, and if he fails so to do, he is guilty of fraud. It cites *Cable v. United States Life Ins. Co.,* 111 Fed. 19, 27, and *Loewer v. Harris,* 57 Fed. 368, at 373–4. The last is a case where representations were made concerning the output and profits of a business that defendant was selling plaintiff, and, before formal conclusion, defendant discovered and failed to communicate that conditions had changed from what plaintiff supposed them to be. It is said to be an elementary proposition in the law of fraud

that, if one party to a contract knowingly assists in inducing
the other to enter into it by leading him to believe that which
he himself believes to be false, his conduct is fraudulent, and
it matters not whether the result is brought about by misrep-
resentation or by keeping silent when duty requires a dis-
closure. The case quotes with approval from *French v. Vin-
ing*, 102 Mass. 132, 135, as follows:

"Deceit may sometimes take a negative form, and there
may be circumstances in which silence would have all the
legal characteristics of actual misrepresentation."

The *Loewer* case says this:

"The law requires disclosure to be made only when there
is a duty to make it, and this duty is not raised by the mere
circumstance that the undisclosed fact is material, and is
known to the one party and not to the other, or by the addi-
tional circumstance that the party to whom it is known knows
that the other party is actually in ignorance of it; but when
one of the parties, pending negotiations for a contract, has
held out to the other the existence of a certain state of facts
material to the subject of the contract, and knows that the
other is acting upon the inducement of their existence, and,
while they are pending, knows that a change has occurred
of which the other party is ignorant, good faith and common
honesty require him to correct the misapprehension which he
he has created. It becomes his duty to make disclosure of the
changed state of facts, because he has put the other party off
his guard. The doctrine is thus stated by Mr. Pollock, in his
work, Principles of Contracts, page 491: 'It is sufficient if
it appear that the one party knowingly assisted in inducing
the other to enter into the contract by leading him to believe
that which was known to be false. Thus it is where one
party has made an innocent misrepresentation, but, on dis-
covering the error, does nothing to undeceive the other.'"

The *Cable* case, supra, holds that a statement in the
application of good health and freedom from disease, and
specifically from pneumonia, constitutes a warranty of the con-

tract as though declared simultaneously with the delivery of the policy; that, if there had been a change in health between the time of the application and the delivery of the policy, the company was entitled to know of it, and to be fully informed concerning it, that it might determine whether, notwithstanding such change, it would consummate the agreement and deliver its policy. In *Morrison v. Muspratt,* 4 Bing. 60, one was by a physician represented to the insurers, in December of a certain year, as enjoying ordinarily a good state of health. This representation was repeated in March following. The insurance was effected in April. Between December and March the person had been ill with a pulmonary attack, and was attended by a physician other than the one who had made the representation to the insurance company, but no disclosure of the circumstances was made to the insurer. In April, a year after the issuance of the policy, the assured died of pulmonary disease. While this was a case of mere representation in a warranty, the court held that the facts of the illness and of the attendance of the other physician should have been disclosed.

In *Piedmont & A. Life Ins. Co. v. Ewing,* 92 U. S. 377, the court held there was no valid contract, saying:

"It cannot for a moment be contended that, while parties are still in negotiation as to the terms of a contract, one of them, learning of a total change in the condition of the subject-matter of the contract of which the other is ignorant, can at that moment accept terms which he has refused before, and by doing so, bind the party who had offered those terms when the condition of affairs was wholly different."

In *Guilford v. Roberts* (Ind.), 62 N. E. 711, a woman applied for a position as school teacher, and, in her first interview with the trustee, stated that she was not married, and did not intend to be during the school year, the trustee telling her he would not employ a married woman as a teacher. Two months thereafter, she signed a contract in her maiden name, at which time she had been married four days, without the

knowledge of the trustee; and it was held the contract was voidable for fraud.

In *Cable v. Life Ins. Co.*, 111 Fed., at 27, it is said:

"With respect to fire insurance, it has been held that if one knowing of a conflagration near his property, without disclosing the fact, procure insurance of an underwriter ignorant of the fact, the contract is void."

Both are cases in which investigation was open to the person wronged. But that did not avail; because, while both *might* have known, one *did* know, and kept silent in the hope that the other would not learn. As to a contention like the one that the inspection was a cure-all, the *Cable* case says:

"It is true that a medical examination will ascertain many things necessary to be known; but there is a large field of inquiry which cannot be so disclosed, and which may be essential to the risk to be assumed . . . So, also, in the interval between the medical examination and the execution and delivery of the policy, a serious change in the health of the assured may have occurred, of which the insurer might be and probably would be wholly ignorant. The insurer has, therefore, a right to rely upon the utmost good faith upon the part of the assured, and though the latter may not be bound to communicate, if uninquired of, all the details of his life which might affect the judgment of the insurer with respect to the assumption of the risk, he is certainly bound to disclose any impending peril to life not known to the insurer, and of which the latter cannot reasonably be said to be put upon inquiry."

It was held, in *Sun Ins. Co. v. Ocean Ins. Co.*, 107 U. S. 485, that it was the duty of the assured to communicate all material facts, and he cannot allege, as an excuse for his omission to do so, that they were actually known to the underwriter, unless the knowledge of the latter was as full and particular as his own information. There may not be a silence which is aided by what is calculated to mislead. Thus, where insurance was applied for upon a vessel "lost or not

lost," the applicant knowing of its loss, but concealing his knowledge from the insurer, the court held the concealment to be a fraud, destroying the validity of the contract, remarking:

"When the company came to make this instrument, they were entitled to the information which the plaintiffs had of the loss of the vessel." *Insurance Co. v. Lyman*, 15 Wall. (U. S.) 664.

It is said in *Cable v. Life Ins. Co.*, 111 Fed., at 26:

"It is a general rule that meditated silence, there being no duty to speak, will not avail to avoid a contract. There being no duty to communicate intelligence, the one party is not bound to speak although he may know that the other party lies under a mistake. This is because the parties are dealing with each other at arm's length. But even in such case the *suppressio veri* must rest in silence, not in partial and misleading statement. The latter amount to *suggestio falsi;* for, as it has well been said, 'a half truth is often the greatest of lies.' If one would deal at arm's length, he must remain silent. He may not speak that which is certain to deceive and suppress that which would challenge attention, disclosing the truth. If the matter be with respect to a material fact, which, if known to the one party and not to the other, would, if disclosed, induce that other to refrain from contracting, either wholly or upon the terms proposed, the one having knowledge of the fact, if under no duty to disclose, may not, by a partial statement, throw the other party off his guard, when disclosure of the truth and the whole truth would have prevented his action."

The *Cable* case deals with what is said to be a casual statement, partial and misleading, the manner of its delivery being such as to ward off, rather than to invite inquiry, and to convey to McCabe the impression that Cable was, if at all, but slightly indisposed.

This is not a case of suing for false representation that a horse had two good eyes, when before buying he was inspected

and palpably exhibited two blind ones. It is a case of what is, in effect, false token. It is not different in principle from bargaining to sell a hotel building, sending the proposed buyer to look at it, having him find that the building is somewhat racked and would not withstand heavy winds, learning later that a wind had blown it to the ground and scattered the fragments, affirmatively telling the buyer before he contracts that the building is substantially as it was when he saw it, and claiming that, though there was no building when the purchase was completed, yet there could be no rescission. We perceive no substantial difference between what was done here and what the case would have been if Noble never had looked at the land, and had been told, after defendant got his advice from Kelley, that there was no bad cutting or washing, and no danger of the farm buildings' going into the river.

III. Defendant claims that plaintiff's loss is made good by an allowance in the purchase price. There is testimony that Noble said, on returning from the inspection, that he should get the land at a lower price; that it

**3. Vendor and Purchaser: rescission by purchaser: defense: contracting in recognition of defects.** ought to be worth $25 an acre less on that account; that he would make defendant a proposition, but it would be way down; that he told defendant there was not as much land

as defendant thought, and thereupon made a lump sum offer, which involved an allowance for the loss on account of the river; that Noble said on his return that "a fellow ought to get it for $25 less an acre than he would land a mile or two away from the river." Now, defendant says that, before plaintiff went to look at the farm, he was to allow him $125 an acre, and defendant was to take the stock at $10,000. After his return, so says defendant himself, plaintiff said he would give his interest in the store for the farm if defendant would give $2,200; that defendant asked him what he figured the farm worth an acre, and he answered that defendant could figure it to suit himself,—he was making a lump proposition; that defendant said it was too cheap, and plaintiff responded,

"Well, of course, I don't know exactly how much land you have there, there may be a good deal less." He said, while he was willing to make a proposition, it would not be near what defendant asked; and on being asked why, he answered that defendant didn't have as much land as he thought he had, whereupon defendant informed plaintiff that he had 114 acres, according to a survey made on December 16, 1911. At the strongest, defendant claims that, on May 1, 1912, the land was worth $80 to $90 an acre. Plaintiff testifies that the $2,200 boot money was not paid as an allowance for land that had gone into the river; that nothing was mentioned about it, and that it was not thought of by him. It is upon this record that defendant says that he made an allowance "for what had gone in there, and the damage it might do and the land that had gone into the river." He says plaintiff should have no relief, because the parties contracted in recognition of the loss of the land, and figured the farm several thousand dollars cheaper on account of the river's changing its bed; that it appears, though it is said it is not controlling, that an allowance of at least $6,000 was made to equal the value of the land washed away, not only up to the time of the trade, but to February, 1913, nine months later, when Noble had a survey made; that Noble has $2,200 of defendant's money and has the 70 acres that remained.

Aside from plaintiff's denial, there are other things that militate most strongly against this special avoidance on part of defendant. Two witnesses say that, on inquiry by defendant as to what the stock was worth, he was informed that it invoiced between $12,000 and $13,000, and that he answered that, if it was worth $5,000, he would come out all right on the deal. Defendant responds that he doesn't think he inquired of one of these witnesses and said this to him, and says he made no such statement to the other. The court found that plaintiff's interest in the property transferred to defendant was $9,684.31, and we think the evidence fairly shows that it was substantially worth about $10,000. Where

is this allowance of $6,000 for land that went in up to February, 1913? It is conceded that all but some 70 acres went in by that time. Defendant himself puts that at not more than $80 to $90 an acre. At $90, it comes to $6,300; and plaintiff paid substantially $10,000 for it.

IV. Rescission was prompt. The property transferred to defendant was in turn transferred to an innocent pur-

4. VENDOR AND PURCHASER: rescission by purchaser: when vendee entitled to money judgment. chaser. Hence there was a money judgment against defendant and Oscar Renner, a surety on a bond given by him to discharge attachment. All must be, and is,—*Affirmed.*

EVANS, C. J., LADD and GAYNOR, JJ., concur.