## TRAVELERS INS. CO. v. WILKINS et al.

### No. 125.

District Court, S. D. Florida, Jacksonville Division.

May 13, 1940.

---

[1] No opinion for publication.

Marks, Marks, Holt, Gray & Yates, of Jacksonville, Fla., for plaintiff.

Stockton, Ulmer & Murchinson and Latham & Elmore, all of Jacksonville, Fla., for defendants.

STRUM, District Judge.

The two policies here in litigation were issued by plaintiff Insurance Company on the life of Randolph C. Wilkins pursuant to his written application dated March 14, 1939, and supplemental application dated April 12, 1939.

In the original application the following language appeared:

"17 (B). That every statement hereinabove contained is true; and that the contract issued hereupon shall not take effect unless the first premium shall be actually paid while I am in good health insofar as I have knowledge or information."

On April 12, 1939 the applicant submitted himself to Dr. May, the Company's Medical Examiner, at which time he was found to be apparently in good health. In the medical examination the following questions were asked by the Medical Examiner, and the following answers given by the applicant:

"13. Have you ever had: (A) Fainting spells, vertigo or dizziness? Answer, No. Q. Disease of heart? Answer, No."

"15. (A). What physician did you last consult? Answer, Dr. Swift, of Jacksonville, Florida.

"(B). When? Answer, 1936.

"(C). For what? Answer, Fever.

"(D). Duration of illness? Answer, three or four days.

"(E). Present health? Answer, Good."

The above answers were true when made, but due to the circumstances hereinafter mentioned were no longer true when the policies were delivered and first premium paid.

The policies were not immediately issued. Because of certain conditions apparent in applicant's urinalysis, the Company requested its Medical Examiner, Dr. May, to make further examination of the applicant which was done on May 5, May 6, and May 18, 1939, at which time the applicant was in Dr. May's office for these examinations.

The Company executed the two policies applied for under date of May 9, 1939, and forwarded them to its local representative in Jacksonville, with instructions to hold them until further notice. Following Dr. May's additional urinalyses above mentioned, the Company instructed its Jacksonville representative to release the policies on May 25, 1939. Thereupon the policies were turned over to the Agent who secured the application, and he in turn delivered them to the applicant about June 1, 1939.

Meanwhile, however, certain changes in Mr. Wilkins' health had occurred which had a vital bearing upon the continued truth of the answers he had made in his application. On April 28, 1939, before his application had been accepted by the Company, and long prior to the delivery of the policies and payment of the first premium, and even before the additional examinations of applicant by Dr. May on May 5, 6 and 18, 1939, Mr. Wilkins consulted his family physician, Dr. Swift, stating to him that he, Mr. Wilkins, had several days before experienced a feeling of weakness in his stomach, and that one or two days prior to April 28th he felt a lump in his chest, was weak and "fainty." Dr. Swift took a blood pressure test and found Mr. Wilkins' blood pressure to be 140 over 95, about normal for his age. Blood count was also normal. A fluoroscopic examination of Mr. Wilkins' heart was made on April 28, 1939. Dr. Swift gave Mr. Wilkins a simple tonic, told him to cut down very materially on his smoking and working, and also had another doctor take an electro-cardiograph of his heart action.

April 29, 1939 Mr. Wilkins returned to Dr. Swift's office, at which time, on further examination, Mr. Wilkins' blood pressure was found to be 125 over 80, a material reduction, and his blood count normal. Dr. Swift had then diagnosed the electrocardiograph and found the rate and rhythm of Mr. Wilkins' heart action to be within normal limits for his age, but found that there was a slight toxicity of the heart muscle, apparently caused by the presence of a slight toxic poisoning.

May 9, 1939 Mr. Wilkins again returned to Dr. Swift's office, and said he was feeling stronger, but three or four blocks of rapid walking caused the lump to reappear in his chest. Dr. Swift advised him to continue the same treatment.

May 23, 1939 Mr. Wilkins again returned to Dr. Swift's office and reported that he

was feeling better, but that the lump in his chest was noticeable up to two days before, which was May 21st.

May 31, 1939 Mr. Wilkins again returned to Dr. Swift's office and reported that he had no further discomfort, the lump was not noticeable, and Dr. Swift discharged him from further treatment, except that he told him to continue to cut down on his smoking and working. Dr. Swift at that time told Mr. Wilkins he had a toxic poisoning of the heart muscle, but that the condition was not necessarily serious and that if he "behaved himself," that is, cut down on his smoking and working and followed the doctor's directions that he saw no reason why he should not live a long time yet. This was on May 31, 1939. The policies in question were delivered from one to three days later. The first premium was paid June 12 or 13, 1939. Mr. Wilkins continued in apparent good health, and continued to perform his business activities of operating several filling stations, including the building of a new filling station, and continued the ordinary recreational activities of a man in sound health until October 30, 1939, approximately four months later, when he was suddenly stricken with a heart attack and died in ten minutes.

Dr. Swift saw him just as he was expiring. In the death certificate Dr. Swift stated the cause of death to be "coronary thrombosis due to myocarditis, chronic six months." Six months prior to October 30th was April 30th, when he was under active examination and treatment by Dr. Swift for the heart condition, which was then diagnosed and reported to Mr. Wilkins to be toxic poisoning of the heart muscle.

Mr. Wilkins did not report to the Insurance Company, or any of its representatives, any of these symptoms, or the heart ailment above mentioned, nor the fact that he had consulted and had been treated by Dr. Swift therefor, although Mr. Wilkins was in the office of Dr. May, the Company's Medical Examiner, for further examinations on May 5, 6, and 18, 1939, which was during the time that he was under active observation and treatment by his own physician, Dr. Swift, for the heart ailment already mentioned. When the policies in question were delivered to Mr. Wilkins about June 1, 1939, the Insurance Company and its representative had no knowledge of these intervening heart symptoms, nor of Dr. Swift's treatment of Mr. Wilkins. Nothing whatever was said by Mr. Wilkins about these matters. He merely accepted the policies, based on his previous application which contained the questions and answers above quoted, paying the first premium on the policies about two weeks later, June 12 or 13, 1939.

The policies, as delivered, contained the following provision: "Entire Contract— This instrument and the application constitute the entire contract between the parties hereto, and all statements purporting to be made by and on behalf of the insured shall in the absence of fraud be deemed representations and not warranties and no statement shall avoid the contract or be used in defense to a claim under the contract unless it be contained in the application herefor and a copy of such application is attached hereto."

The Court finds that when the policies were delivered about June 1, 1939, and the first premium paid on June 12 or 13, 1939, the following answers in Mr. Wilkins' applications were no longer true: "Have you ever had fainting spells, vertigo, or dizziness? Answer, No." "Have you ever had disease of the heart? Answer, No." "What physician did you last consult? Answer, Dr. Swift, Jacksonville, Florida." "When? Answer, in 1936, for fever, duration 3 or 4 days." "Present health? Answer, Good." When he accepted the policies and paid the first premium, Mr. Wilkins obviously had knowledge or information of the facts and circumstances which rendered those answers no longer true, but he did not communicate these facts and circumstances to the Company, nor to any representative thereof. The Company had no notice or knowledge of the same until it received proof of Mr. Wilkins' death shortly subsequent to October 30, 1939. This suit to cancel the policies was commenced November 29, 1939, within a month.

■ The policies are Florida contracts. There is no authoritative decision, squarely in point, by the Supreme Court of Florida. The case most nearly in point is Massachusetts Bonding & Ins. Co. v. Hoxie, 129 Fla. 332, 176 So. 480, 482, which holds, with what seems to be the weight of authority, that if the insured intentionally conceals facts which are material, he is guilty of fraud which renders the contract voidable. This decision quotes with

approval a Montana case, Pelican v. Mutual Life Ins. Co. of New York, 44 Mont. 277, 119 P. 778, holding that "concealment by insured of a fact material to the risk is equivalent to a false representation that the fact does not exist."

The Hoxie case quotes with approval the North Carolina case of Whitley v. Peidmont & Arlington Life Ins. Co., 71 N.C. 48, holding that "it is the duty of the assured to communicate to the Company, any material change in his health, in the interval between the application and the completion of the contract by the payment of the premium." The Florida Court also holds that "a concealment is material when the knowledge or ignorance of the fact involved will influence the judgment of the underwriter as to whether or not he will enter into the contract." These propositions of law this Court adopts as the law of Florida applicable to this case, as well as the holding in Piedmont & A. Life Insurance Co. v. Ewing, 92 U.S. 377, 23 L.Ed. 610, also quoted with approval by the Florida Supreme Court in the Hoxie case, to the effect that while the parties are still in negotiation, when one of them learns of a change in the condition of the subject matter of the contract of which the other is ignorant, he cannot at that moment accept the terms which he has refused before, and so bind the other party.

What is said by the Supreme Court of Florida in the Hoxie case is entirely in harmony with the holding of the Supreme Court of the United States in Stipcich v. Metropolitan Ins. Co., 277 U.S. 311, 48 S.Ct. 512, 513, 72 L.Ed. 895, where it is said: "Even the most unsophisticated person must know that, in answering the questionnaire and submitting it to the insurer, he is furnishing the data on the basis of which the company will decide whether, by issuing a policy, it wishes to insure him. If, while the Company deliberates, he discovers facts which make portions of his application no longer true, the most elementary spirit of fair dealing would seem to require him to make a full disclosure. If he fails to do so the company may, despite its acceptance of the application, decline to issue a policy, * * * or, if a policy has been issued, it has a valid defense to a suit upon it." Paraphrasing what was said by the Supreme Court in the Stipcich case, this Court holds that this generally recognized rule, in the absence of authoritative local decision in Florida, will be taken to be the law of that State. While the Florida Hoxie case is not squarely in point on the facts, this Court is of the opinion that the principles of law therein enunciated are controlling here, and are fully in harmony with the Stipcich case.

In the Florida case of New York Life Ins. Co. v. Kincaid, 122 Fla. 283, 165 So. 553, text page 557, relied upon by the beneficiary in her cross-action to recover on these policies, it is said: "Even if he [insured] failed to make a full disclosure with reference to his insurability, it does not necessarily vitiate his reinstatement. The test is whether or not his answers to the questionnaire were made in good faith." This is entirely harmonious with the holding in the Hoxie and Stipcich cases, supra. Where the insured is asked, for example, whether he is in good health, or has suffered from specified diseases, and he answers in the negative, his policy will not be voidable even though the answer is in fact untrue, so long as his negative answer was made in good faith. See Mutual Life Ins. Co. v. Hurni Packing Co., 8 Cir., 260 F. 641. Such questions call merely for the opinion or judgment of the applicant. All that is required is that he answer the same in good faith. Where, however, as here, the question propounded calls for a statement of a material fact within applicant's knowledge, and he fails to disclose the same,— as for example whether he has consulted a physician, for what, and the duration of treatment,—he is guilty of fraud in law, even though he had no conscious intent to deceive. New York Life v. McCarthy, 5 Cir., 22 F.2d 241. This principle is recognized by the Supreme Court of Florida in the Kincaid case supra, where it is said, 165 So. text page 559: "It is also academic that failure by the one insured to disclose conditions material to the risk of which he is aware makes the contract voidable at the insurer's option. This principle is well settled and is approved by this court." If Mr. Wilkins' symptoms and treatments here involved had existed at the time of his application, and disclosure thereof had not been made, no one would question the voidability of the policies because of such failure to disclose these material facts. Failure to disclose them is no less objectionable because they arose in the interim between the application and the delivery of the policies.

122

■ There is a continuing duty on the part of the applicant to disclose newly discovered matters arising between the application for and the consummation of the contract where they come to the applicant's knowledge and render his former answers no longer true. See the Florida Hoxie and the Stipcich cases, supra. United States v. Elliott, 5 Cir., 73 F.2d 374; Cable v. United States Life Insurance Co., 7 Cir., 111 F. 19; Mutual Benefit Health & Accident Ass'n v. Snyder, 6 Cir., 109 F.2d 469.

Even if Mr. Wilkins thought himself to be in good health when he was discharged from further treatment by Dr. Swift on May 31, 1939, he knew of the above mentioned symptoms experienced by him since submitting his application; he knew of his heart condition, and that he had been under active and extended treatment therefor. Since these events rendered some of the former answers no longer true, it was his duty to frankly disclose these facts to the Company so that it could exercise its own judgment as to whether it would accept him for insurance in view of the changed conditions. This is true even though he had no conscious intent to deceive. New York Life v. Odom, 5 Cir., 93 F.2d 641.

Conceding that good faith is all that was required of him in his answers, his failure to disclose these newly discovered facts is inconsistent with the requisite good faith in making contracts of insurance. Pacific Mutual Life Ins. Co. v. Cunningham, 5 Cir., 65 F.2d 909; New York Life Ins. Co. v. Bullock, D.C., 59 F.2d 747.

■ These were not mere trivial or casual symptoms or ailments, failure to mention which is excusable. On the contrary, they were material to the risk assumed by the Company. Dr. Swift himself testified that no prudent Insurance Company would insure a person having these symptoms, within at least two years after their occurrence.

■ As the evidence is undisputed that Mr. Wilkins did not disclose these matters and that the Company did not know of them and had no means of learning thereof,—there being no waiver or estoppel against the Company,—the Court concludes that the policies are voidable and should be cancelled, upon payment to Mr. Wilkins' legal representative of all premiums paid thereon, with interest to November 28, 1939, when the Company tendered them.

Judgment accordingly.