## WILKINS v. TRAVELERS INS. CO.
### No. 9640.

Circuit Court of Appeals, Fifth Circuit.

Feb. 18, 1941.

Rehearing Denied March 20, 1941.

HUTCHESON, Circuit Judge, dissenting.

Charles H. Murchison and Rhydon C. Latham, both of Jacksonville, Fla., for appellant.

Francis M. Holt, of Jacksonville, Fla., for appellee.

Before FOSTER, HUTCHESON, and McCORD, Circuit Judges.

McCORD, Circuit Judge.

Travelers Insurance Company brought suit to cancel two $5,000 policies of life insurance issued to Randolph C. Wilkins. It was the contention of the insurance company that Wilkins, after he had signed the application for insurance but before he paid the first premium, had visited his physician for treatment; that he violated paragraph 17B of the application in that after visiting his doctor he had knowledge and information that he was not in good health; that he failed and refused to disclose this information to the company; and that such failure constituted a concealment or suppression of material facts and thereby perpetrated a fraud upon the company. Mildred T. Wilkins, the widow of Randolph C. Wilkins and beneficiary under the policy, answered the complaint and denied the charges, and on cross-complaint prayed that upon a final hearing the court enter its decree upholding the policies and requiring the insurance company to pay the principal amount of the policies plus interest and attorney's fees. A trial was had and the court, after determining that there was no issue of fact to be submitted, discharged the jury. The court thereupon found the issues in favor of the Travelers Insurance Company and entered judgment canceling and holding void the two policies. From this judgment Mildred T. Wilkins appealed. The opinion of the trial court is reported, Travelers Ins. Co. v. Wilkins, D. C., 33 F.Supp. 117.

On March 14, 1939, Randolph C. Wilkins signed "Part 1" of an application for insurance with the Travelers Company, and thereafter on April 12, 1939, he signed "Part 2" of the application. "Part 1" consisted of answers to questions propounded by the company's agent, and "Part 2" consisted of answers to questions propounded by the company's examining physician. On May 5, 6, and 18, 1939, Wilkins again presented himself to the company's doctor for a further and thorough physical examination. As a result of the examinations the company physician ascertained that Wilkins was in good health. The doctor certified his findings to the insurance company and the two policies of life insurance were issued. The policies were delivered to Wilkins and he paid the first premium on June 14, 1939.

It is without dispute that the answers to the questions in the application for insurance, both as to "Part 1" and "Part 2", were true when made, and that the application was attached to and made a part of the two policies issued to Wilkins. The two paragraphs of the policy contract which are important to decision of this case are as follows:

*"Entire Contract*—This instrument and the application constitute the entire contract between the parties hereto, and all

statements purporting to be made by or on behalf of the Insured shall in the absence of fraud be deemed representations and not warranties and no statement shall avoid the contract or be used in defense to a claim under the contract unless it be contained in the application herefor and a copy of such application is attached hereto."

"17B. That every statement herein above contained is true; and that the contract issued hereupon shall not take effect unless the first premium shall be actually paid while I am in good health in so far as I have knowledge or information."

On April 28, 1939, Wilkins consulted his personal physician, Dr. Edwin C. Swift, and advised him that a few days before his visit he had noticed a lump in his chest and had experienced a feeling of dizziness while walking. He made known to his doctor that he had been working an average of fourteen to sixteen hours a day for many years, and that he smoked two or three packages of cigarettes a day. Dr. Swift gave Wilkins a thorough physical examination including an electrocardiogram. Dr. Swift testified that he found Wilkins normal and healthy with the exception of what was diagnosed as a toxic heart muscle, which he attributed to excessive smoking and overwork. Wilkins visited his doctor three or four times and on May 31, 1939, Dr. Swift told him that if he would cut down on his smoking and lighten up on his work he would have no cause to give the matter further thought. On that day his physician discharged him "as a man in good health."

Dr. Swift was given a rigid examination by counsel and the court. We quote excerpts from his testimony:

"The Court: You say you had diagnosed that electrocardiogram. What was your opinion about that? A. My opinion on this electrocardiogram was, the electrocardiogram was within perfectly normal limits for a man of his age with the exception of one or two slight discrepancies that might mean a toxicity of the heart muscle; a slight poisoning of the heart muscle. Rate, rhythm, direction of all waves, with one exception, were normal. * * *

"Q. That heart condition you spoke about, disclosed by the electrocardiogram. Was there anything shown that you would describe as an organic infirmity? A. There was not.

"Q. Would you describe that, what you call a slight condition of toxicity, a functional impairment or not? A. Yes. I would call it a functional impairment; a functional irritation.

"Q. Functional irritation? A. Yes, sir.

"Q. Of a transitory nature as a rule, or more or less chronic nature? A. Shown by his progress during the course of five weeks, transitory."

"Counsel Murchison: Dr. Swift, was it your opinion, that anything that was indicated from this examination of Mr. Wilkins, was anything but a toxic condition which was completely transitory in its nature? A. That was my impression at that time and I so informed Mr. Wilkins that he had nothing to worry about, in my opinion, at that time.

"Q. When you discharged him did you say anything to Mr. Wilkins as to your opinion in that regard? A. Yes, I told him, 'You can forget it as long as you behave yourself. In the matter of cutting down and keeping your cigarettes cut down and not going back to sixteen or fourteen hours work a day; you can forget your heart.'

"Q. In other words, it is your opinion and you discharged him as a man in good health? A. It is my opinion and I discharged him as a man in good health, with the admonition that I give all my patients, 'If I can be of further help to you, I will hear from you.'

"Q. Did you tell him if he had a recurrence or any indisposition, to come back to see you, or not, later? A. I always tell the patient that.

"Q. Did he come back to see you? A. I did not see him until the night of his death.

"Q. Was there anything that you can remember that you said to Mr. Wilkins that would, in your opinion, convey to his mind that he was not a well man when you discharged him? A. No, not in the least."

Wilkins went from the doctor's office with the opinion of that expert that he was a well man, and with his advice that he could forget his heart. His conduct from that time out indicates that he believed that he was in good health. He went back to work without taking any time off; his doctor had given him no medicine for his heart; he continued to work constantly and strenuously building a new filling station, doing much of the work with his own hands; and he continued to work in and about his business until October 30, 1939,

when, without disclosing any sign of illness, he died suddenly of coronary thrombosis.

The record shows that the agent of the insurance company sought out Wilkins and induced him to take out the two policies of insurance. Wilkins' conduct was not that of a man seeking to defraud the insurance company: The agent tried to write additional insurance for him but he refused to take it; he directed that his premiums be changed from the monthly basis to semi-annual payments; he added another filling station to those he already owned. His conduct was that of a man who expected to live. It was his opinion, and that of his physician, that he was a well man, and on June 14, 1939, when he paid the premium on his insurance policies he was in good health insofar as he had "knowledge or information". This was in full conformity with paragraph 17B of the policy contract.

Whatever information Dr. Swift conveyed to Mrs. Wilkins about her husband's health, so far as the record discloses, was never brought to the attention of Wilkins and should be given no weight or bearing with reference to the "knowledge or information" of the insured.

The cases relied upon by the appellee and the trial court are not controlling: Stipcich v. Metropolitan Life Ins. Co., 277 U.S. 311, 48 S.Ct. 512, 72 L.Ed. 895; Massachusetts Bonding & Ins. Co. v. Hoxie, 129 Fla. 332, 176 So. 480; New York Life Ins. Co. v. Odom, 5 Cir., 93 F.2d 641. In the Stipcich case the applicant, before delivery of the policy and payment of the first premium, suffered a recurrence of a duodenal ulcer and was informed by two physicians that the ulcer would have to be removed by an operation. It was alleged that Stipcich failed to disclose this condition of which he was fully aware. In the Hoxie case indemnity insurance policies were involved and the insured concealed the fact that an accident had occurred for which the insurer might be liable under its policies which had been antedated at the request of the insured. A fraud upon the insurance company. In the Odom case the insured made false statements in his application for reinstatement of policies which had lapsed for nonpayment of premiums. The facts of the case at bar set it apart from the cases relied upon by the appellee. Here we have no such conduct on the part of the insured. This is not a case for the application of the doctrine of "continuing representations" for Wilkins acted in the utmost good faith and in accordance with the express provisions of the insurance contract. He accepted the policies of insurance and paid the first premium while he was in good health insofar as he had "knowledge or information", paragraph 17B.

Applying the uncontradicted facts and giving full weight to the contract provisions of the policies, we are of opinion and so hold that the policies were valid and subsisting contracts at the time of Wilkins' death and that the court erred in entering judgment for the insurance company. New York Life Ins. Co. v. Kincaid, 122 Fla. 283, 165 So. 553; New York Life Ins. Co. v. Kincaid, 136 Fla. 120, 186 So. 675; Winer v. New York Life Ins. Co., 143 Fla. 652, 197 So. 487; Cf. Stipcich v. Metropolitan Life Ins. Co., 277 U.S. 311, 315, 48 S.Ct. 512, 72 L.Ed. 895.

The judgment is reversed and the cause remanded with direction to enter judgment for the appellant for the principal amount of the two policies together with interest from the date of Wilkins' death and reasonable attorney's fees.

Reversed and remanded.

HUTCHESON, Circuit Judge (dissenting).

The district judge, before whom the case was tried without a jury, in a well considered opinion, has found and stated the facts against appellant. For the reasons given in that opinion I dissent from the reversal of the judgment.