**SUN LIFE ASSUR. CO. OF CANADA v. MALONEY.**

**No. 10442.**

Circuit Court of Appeals, Fifth Circuit.

Dec. 23, 1942.

H. P. Osborne, of Jacksonville, Fla., and Thos. McE. Johnston, of Miami, Fla., for appellant.

C. L. Brown and Robert F. Underwood, both of Miami, Fla., for appellee.

Before SIBLEY, HUTCHESON, and HOLMES, Circuit Judges.

HUTCHESON, Circuit Judge.

The suit upon a life insurance policy was for the death benefits it provided. There were two defenses. The first was; that the insured had agreed "that the policy shall not take effect unless and until the first premium shall have been paid while I am alive and in good health"; that he was not in good health when the first premium was paid; and that the policy, therefore, had never taken effect. The second was that no recovery could be had on the policy because insured in his application for it had given false answers to questions calling for the disclosure of material facts. To question 20, "Have you ever suffered from or consulted a physician for any complaint or affection: * * * (c) Of the heart or blood vessels (palpitation, high blood pressure, angina pectoris or pain in the chest included)", he answered "No". To question 24a, "Have you during the past five years been examined or treated by, or consulted a physician or other practitioner, other than as mentioned above? Give details." and question 24b, "Have you ever had advice about your heart or lungs or submitted to electrocardiographic or X-Ray examination or to blood tests?", he answered "No", and he gave these answers, though he had in fact consulted, been examined and treated by a physician, a ten day rest in bed being prescribed for a heart condition, and also had in fact at the same time and as part of the examination submitted to an electrocardiographic examination. Defendant on uncontroverted affidavits moved for a summary judgment. This denied, there followed: a trial to a jury; a motion by defendant for a directed verdict; a denial of the motion; and a verdict and judgment for plaintiff. Defendant is here insisting that the materiality and falsity of insured's answers and that he was not in good health

when the first premium was paid were established by the evidence [1] as a matter of law, and a verdict for defendant was demanded, urges that for the failure to instruct a verdict the judgment should be reversed and here rendered for defendant. Appellee on her part denies this. She insists that whether insured was in good health at the time the premium was paid and whether the representations were false presented fact issues requiring their submission to the jury. The greater part of the briefs of both appellant and appellee are devoted to the first defense, whether insured was in good health when the premium was paid. Appellee, citing Wilkins v. Travelers Ins. Co., 5 Cir., 117 F.2d 646, insists that the invoked provision is merely

[1] We need not set it out at any length. It is sufficient to say that it was established by the uncontradicted evidence of insured's physician, Dr. Hardie, that about eighteen months before the insured took out the policy, Dr. Hardie ordered him to bed for ten or fifteen days; that as a part of the examination and treatment he was, on Hardie's advice required to submit to an electrocardiographic examination; indeed the court instructed the jury, "There is no real dispute in this case that Dr. Hardie did attend Maloney and that an electrocardiographic examination was made. It is also established by the undisputed evidence that this question and the answers to it were material to the risk". Hardie further testified that at the time of his death the insured suffered from a heart attack of some description and that he certified in support of his claim under that policy that the insured died of Coronary occlusion and that the condition of which he died was the same condition he had suffered from eighteen months before. In regard to that consultation and treatment, he testified that in December, 1938, Maloney consulted him, that he made a diagnosis of what he thought at that time was a mild coronary occlusion and that he found assured's blood pressure markedly elevated to almost 200 over 130. Asked this question, "Did Mr. Maloney, during this month of December, 1938, and in connection with this attendance by you on him, submit to an electrocardiograph?", he answered, "Yes, he did". Asked "Did you suggest to him that he should have a cardiogram made of himself?", he answered, "Well, I probably didn't say 'cardiogram' at the time; I probably said 'tracing' to him, to try to make it a little clearer." Further testifying, he said that he had suggested Dr. Nichols and that Dr. Nichols' technician made a cardiogram and sent him a specimen of it with his interpretation. "I am not positive but I am pretty sure that I asked Dr. Nichols to make the cardiogram if possible as bad as he could. I thought I could keep Jack in bed. I found his blood pressure markedly elevated, and if a man near forty has high blood pressure, it is the safest thing to keep him in bed and the cardiogram was made two days after I had checked his blood pressure." On cross examination, when asked "Was he willing to go to bed at the time you ordered him to go to bed, doctor?", replied, "Yes, he did go to bed. He made a protest the first day or two." "Did you tell him that you suspected or had any idea it might be a possible heart condition?" "That would be difficult for me. * * * I tell different individuals different things. Some can stand a suspicion and some cannot. It worries them mostly. In view of the fact that I ordered him to bed I must have had some suspicion." "And after he was in bed a day or two you ordered this electrocardiogram?" "That is right." "Did you ask Jack about submitting to it?" "I explained to Jack it was a more or less expensive procedure, and I thought it would certainly be a good thing to have. If he didn't have anything wrong it was all fine and dandy; if he did, it would be well to find out." "Did you tell him in the words: I want you to get an electrocardiogram, or just what words did you use?" "There again it is too long. * * * It would be hard to say if I said 'electrocardiogram' or told him I was going to take a tracing of his heart. I probably explained it to him one way or the other. * * * My usual procedure is to tell them I am going to have a tracing." "What is your usual practice when you think a person might have a heart condition?" I put the patient to bed and take care of any symptoms that may arise, and if I am in doubt I have an electrocardiograph."

The cardiogram in Maloney's case showed: "Suspected mild coronary occlusion, but not definitely so. Probable left ventricle hypertrophy." This showed that because of the tracing, he suspected that the left lower chamber of the heart was enlarged. Q. "Do you recall whether you showed this cardiogram and interpretation thereof to Mr. Maloney?" A. "Yes, I showed it to him." Q. "At the time you showed it to him, the cardiogram had that interpretation now appearing thereon?" A. "Yes, sir."

a continued good health clause intended to protect and protecting the insurer against a change of condition between the signing of the application and the payment of the first premium, and that since the evidence conclusively showed that there was no apparent change between those times, there was no breach of agreement. She further insists that if, as appellant contends, the clause protects the insurer not merely against a change of condition between application and premium payment but against a condition of ill health existing at the time of the application, the evidence on this issue was not such as to demand a verdict for defendant. Appellant pointing out that in the Wilkins case the applicant stated that he was "in good health in so far as he had knowledge or information", whereas, in this case he stated flatly and without qualification, "I declare that the above answers are full and true and that I am now and am usually in sound health", insists that this unqualified statement makes the Wilkins case inapplicable. Citing many cases, it insists further; that the agreement in question prevents the taking effect of the policy "if the assured is not in good health when the first premium is paid"; that the uncontradicted evidence showed that the heart condition for which deceased had been examined and treated some 18 months before the policy was issued and from which he died two months after its issuance existed, and because thereof he was not in good health, when the policy was delivered and the first premium was paid. We need not, however, consider or determine whether appellant or appellee has the right of it in respect of the first defense, for we think it settled by Metropolitan Life Insurance Co. v. Madden, 5 Cir., 117 F.2d 446,[2] that the verdict should have been directed for defendant on its second defense that assured falsely answered questions seeking information which was material to the risk. In view of the evidence as to the nature of the examination and the treatment given and that the insured was a highly intelligent man, and the lack of evidence that his mind or his memory had failed, there was no fact issue for the jury, for reasonable minds having no interest except to find the truth could not have found that the answers admittedly material were not also false. For the failure to direct a verdict, the judgment is reversed and the judgment which should have been rendered on the instructed verdict is here rendered for defendant.

Reversed and rendered.

[2] Besides those cited in the Metropolitan opinion, other cases to the same effect are New York Life v. Price, 5 Cir., 16 F.2d 660; Tutewiler v. Guardian Life Ins. Co., 5 Cir., 42 F.2d 208; Aetna Life Ins. Co. v. Bolding, 5 Cir., 57 F.2d 626; New York Life Ins. Co. v. Stewart, 5 Cir., 69 F.2d 957; Jefferson Standard Life Ins. Co. v. Stevenson, 5 Cir., 70 F.2d 72; McSweeney v. Prudential Insurance Co., 4 Cir., 128 F.2d 660; Geer v. Union Mutual Life Ins. Co., 273 N.Y. 261, 7 N.E.2d 125.